IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tammy L. Williams, :
                Petitioner :
            :
          v. : No. 454 C.D. 2024
            : Submitted: August 8, 2025
Unemployment Compensation :
Board of Review, :
           Respondent :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE STACY WALLACE, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER      FILED: January 22, 2026

Tammy L. Williams (Claimant), pro se, petitions for review of the Unemployment Compensation Board of Review's (Board) March 19, 2024 Order. In the Order, the Board affirmed a Referee's (Referee) determination that Claimant engaged in willful misconduct and, thus, was ineligible for benefits under Section 402(e) of the Pennsylvania Unemployment Compensation Law (UC Law), 43 P.S. § 802(e).[1] Based upon the Board's findings and credibility determinations, as well as Claimant's own admissions, we discern no error in the Board's Order. Accordingly, after careful review, we affirm.

---

[1] Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e).

# I.	BACKGROUND

Claimant was employed full-time as an Imaging Production Specialist I at Iron Mountain Information Management Services, Inc. (Employer). On August 4, 2023, following an investigation, Employer discharged Claimant for violating its Bullying and Harassment Policy and Procedure (Policy), based on a statement Claimant made about a transgender coworker. Claimant then applied for unemployment compensation (UC) benefits. On September 15, 2023, a UC Service Center determined that Claimant was not eligible for UC benefits pursuant to Section 402(e) of the UC Law for violating the Policy without good cause. (UC Service Center Determination, Certified Record (C.R.) at 53.) Claimant filed an administrative appeal, and the Referee held a hearing. At the hearing, two witnesses testified for Employer, specifically an operations manager and an operations supervisor, and Claimant, who was then represented by counsel, also testified on her own behalf. Based on the evidence presented, the Referee affirmed the UC Service Center's determination. Claimant then filed a pro se appeal to the Board.

In its March 19, 2024 Order, the Board found, in pertinent part, as follows:

> 2. [] [E]mployer has a written policy against discrimination, harassment [and] bull[y]ing. The [P]olicy provides that: "[Employer] is committed to enabling a diverse workplace where employees are welcome to contribute to corporate success without feeling unwelcome based on their membership in a legally protected class. [Employer] prohibits discrimination against any employee or applicant for employment, including but not limited to, discrimination on the basis of race, creed, color, national origin, sex, age, disability, religion, veteran status, familial status, marital status, sexual orientation, **gender identity or expression**."
>
> 3. [] [C]laimant received virtual training on the [P]olicy subjects and was aware of them.

2

4. On August 3, 2023, [] [C]laimant was seated next to another employee on the production floor, and that employee was talking to a transgender coworker.

5. When the transgender employee left the conversation, [] [C]laimant asked the employee what type of genitalia the transgender employee had.

6. The employee was offended and reported [] [C]laimant's comment to [] [E]mployer.

7. On August 3, 2023, [] [E]mployer suspended [] [C]laimant pending an investigation.

8. As part of its investigation, [] [E]mployer asked [] [C]laimant to provide her side of the issue and a written statement.

9. [] [C]laimant's written statement says, "I asked [a coworker] a question about someone's private parts."

10. [] [C]laimant told [] [E]mployer she doesn't understand why she can't ask about the private parts someone has. [] [C]laimant further said she thought it was her right to know what private parts the transgender employee had because of the transgender employe[e] using the same bathroom as [] [Claimant. It made her uncomfortable.

11. On August 4, 2023, after [] [E]mployer completed its investigation and gave the information to human resources, [] [E]mployer discharged [] [C]laimant for offensive and [in]appropriate conduct in violation of its [P]olicy against discrimination, harassment, and bullying.

(Board's Findings of Fact (FOF) ¶¶ 2-11 (emphasis and some alterations in original).) Based upon these findings, the Board concluded Claimant engaged in willful misconduct and was ineligible for UC benefits.

In so holding, the Board expressly stated it was resolving any conflicts in the witnesses' testimony in favor of Employer. (Board's Decision at 2.) It reasoned Employer established the Policy existed, Claimant was aware of that Policy, and

3

Claimant violated that Policy by making remarks about the transgender coworker. (*Id.*)

To the extent Claimant claimed she was uncomfortable with the transgender coworker using the same bathroom, the Board explained "[C]laimant had other ways to go about addressing her feelings," such as bringing them to a supervisor's attention, which Claimant admittedly did not do. (*Id.* at 3.) The Board rejected Claimant's argument that the Referee relied on inadmissible hearsay evidence. (*Id.*)[2] The Board further determined that the parties had a full and fair hearing, the record was sufficiently complete, and Claimant did not advance any legally sufficient reasons supporting remand and, thus, denied remand. (*Id.* at 3.) Claimant petitioned this Court for review.

## II.   DISCUSSION

On appeal,[3] Claimant raises multiple issues, which we have consolidated and reordered for ease of discussion: (1) whether Claimant was prejudiced by the

---

[2] The Board, however, did agree with Claimant that certain exhibits regarding Claimant's past warnings were not relevant and should not have been admitted by the Referee, but determined such error was harmless because Claimant was ultimately terminated for violation of a zero-tolerance policy. (*Id.* at 3.)

[3] "Our review [in UC proceedings] is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence." *Hope v. Unemployment Comp. Bd. of Rev.*, 308 A.3d 944, 947 n.5 (Pa. Cmwlth. 2024) (citing Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704). We have defined "substantial evidence" as

> relevant evidence upon which a reasonable mind could base a conclusion. In deciding whether there is substantial evidence to support the Board's findings, this Court must examine the testimony in the light most favorable to the prevailing party, . . . giving that party the benefit of any inferences which can logically and reasonably be drawn from the evidence.

*Sanders v. Unemployment Comp. Bd. of Rev*[.], 739 A.2d 616, 618 (Pa. Cmwlth. 1999).

admission of hearsay, which prevented her from confronting the coworker who reported the incident, particularly given the delay in the coworker reporting, which Claimant maintains casts doubt on the coworker's veracity; (2) whether Claimant's counsel was ineffective for failing to request a continuance to obtain the complaining coworker's statement and/or to subpoena that coworker to testify; and (3) whether Employer met its burden of showing Claimant violated the Policy and was ineligible for benefits under Section 402(e) based on willful misconduct. Because the first and second issues are intertwined, we discuss those together.

### A.    Hearsay and the ability to cross-examine the coworker

Claimant argues evidence was admitted over her hearsay objection and the admission of that evidence was prejudicial and materially affected Claimant's rights because Claimant could not verify whether Employer's witnesses were truthful. (Claimant Brief (Br.) at 14; Claimant's Reply Br. at 4.) Claimant does not identify what statements were purportedly hearsay but, from a review of the transcript, it appears her counsel objected to the admission of an exhibit and to a witness's testimony about the statement Claimant allegedly made. (C.R. at 120, 123.) Claimant further argues that the Board erred in not granting a remand so that she could confront the coworker who made the report. (Claimant Br. at 14.)[4]

---

[4] According to Claimant, the Board violated her rights under the Sixth Amendment to the United States Constitution, U.S. CONST. amend VI, known as the Confrontation Clause, because Claimant was not provided the opportunity, on remand, to confront the reporting coworker. (Claimant's Br. at 14-15 (citing *Crawford v. Washington*, 541 U.S. 36 (2004)).) The Confrontation Clause provides, in part, that "[i]n all **criminal** prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI (emphasis added). The Sixth Amendment protections found in our federal charter are made applicable to the states through the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV. *Commonwealth v. Yohe*, 79 A.3d 520, 530 (Pa. 2013). Article I, section 9 of the Pennsylvania **(Footnote continued on next page…)**

The Board acknowledges Claimant's hearsay objection, but asserts Claimant provided a written statement admitting to making the comment, which Claimant also admitted during her testimony at the hearing. (Board's Br. at 8-9.) According to the Board, these party admissions by Claimant alone are competent evidence sufficient to support its findings of fact that Claimant made such comments. (*Id*. at 9 (citing *Sargent v. Unemployment Comp. Bd. of Rev.*, 630 A.2d 534, 538 (Pa. Cmwlth. 1993)).) Moreover, the Board argues that Claimant could have confronted the coworker and/or obtained any written statement by that coworker, but Claimant was required to subpoena this information and did not do so. (Board's Br.at 9.)

With regard to the admission of evidence, we have held:

> "[h]earsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding of the Board, [i]f it is corroborated by any competent evidence in the record[.]" *Walker v. Unemployment Comp. Bd. of Rev*[.], [] 367 A.2d 366, 370 ([Pa. Cmwlth.] 1976). Moreover, under Pennsylvania Rule of Evidence 803(25), [Pa.R.E. 803(25),] a party's out-of-court admission is an exception to the hearsay exclusion. This Court has long held "that words of a party constitute an admission and therefore may always be used against him." *Evans v. Unemployment Comp. Bd. of Rev*[.], [] 484 A.2d 822, 826–27 ([Pa. Cmwlth.] 1984). This exception is based upon the fact that, unlike hearsay, a party's admission is personal first-hand knowledge, and it may support a referee's finding of fact. *Braun v.*

---

Constitution similarly provides, in part, that "[i]n all **criminal** prosecutions the accused hath a right . . . to be confronted with the witnesses against him." PA. CONST. art. I, § 9 (emphasis added). *See also Commonwealth v. Williams*, 84 A.3d 680, 682 n.2 (Pa. 2014) ("[T]he text of the Pennsylvania Constitution guaranteeing accused persons the right to confront the witnesses against them was made identical to the text of the Confrontation Clause in the Sixth Amendment to the United States Constitution."). Because this case implicates UC proceedings and an appeal therefrom, which are civil administrative matters, the Confrontation Clause and its protections do not apply. *See Crawford*, 541 U.S. at 42 ("[T]his bedrock procedural guarantee applies to both federal and state **prosecutions**") (emphasis added); *Dauphin Cnty. Soc. Servs. for Children & Youth v. Dep't of Pub. Welfare*, 855 A.2d 159, 163 (Pa. Cmwlth. 2004) ("[F]or Sixth Amendment rights to apply, the proceedings must be **criminal**.") (emphasis added).

6

*Unemployment Comp. Bd. of Rev*[.], [] 506 A.2d 1020 ([Pa. Cmwlth.] 1986).

*Sipps v. Unemployment Comp. Bd. of Rev.*, 181 A.3d 479, 483 n.9 (Pa. Cmwlth. 2018). In other words, party admissions against interest, as an exception to the hearsay rule, are considered competent evidence on which a UC referee and the Board may rely in rendering a decision. *See Dillon v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 786 C.D 2012, filed June 18, 2013), slip op. at 9-10 (a claimant's admissions on internet claim form abrogated hearsay objections and a claimant's own admissions established violation of work rule); *Kahn v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 1717 C.D. 2009, filed Mar. 17, 2010), slip op. at 7 (testimony of conversation with a claimant was admissible as party admission against interest).[5]

Claimant's counsel originally objected to admission of Exhibit 46, which was Claimant's handwritten statement. (C.R. at 120.) Claimant's counsel also objected to the testimony of one of Employer's witnesses about the comment Claimant made. (*Id.* at 123.) Clearly, Claimant's own statement would be admissible as a party admission against her and is an exception to the hearsay rule. *Sipps*, 181 A.3d at 483 n.9; *Dillon*, slip op. at 9-10; *Kahn*, slip op. at 7. Moreover, regardless of the admissibility of such evidence, Claimant admitted during her own testimony to making the statement (C.R. at 130), and her testimony as to what she said also clearly is not hearsay. Thus, it was not error to allow such evidence.

Given Claimant's admission that she made the statement, it is not clear what would have been gained had Claimant been permitted, on remand, to confront the

---

[5] Pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P 126(b), and Commonwealth Court Internal Operating Procedure Section 414(a), 210 Pa. Code § 69.414(a), unreported panel decisions of this Court issued after January 15, 2008, may be cited for their persuasive value.

7

coworker who reported the incident to Employer. In her brief, Claimant asserts the coworker "could have been questioned and shown to have been either coerced or encouraged to inform the supervisor" and "what language to use to effectuate the objective – to get Claimant fired." (Claimant's Br. at 14.) But again, it is undisputed that Claimant made the comments, as Claimant admitted so much at the hearing, as well as in her written statement to Employer. Whether someone encouraged the coworker to report the incident has no effect on whether the statement was made, which Claimant admits it was. Claimant's suggestion that the coworker was coached on what to say also is unpersuasive since Claimant admitted to making the comment.[6]

Claimant also argues she could have confronted the coworker about the discrepancy in the date the incident occurred. Claimant asserts the actual date of the incident is August 2, 2023, whereas Employer indicated it was August 3, 2023, and the latter date is what the Board credited. It is unclear how the date of the incident is pertinent to the veracity of the coworker given Claimant's admission to making the statement. However, "[i]n [UC] proceedings, the [UCBR] is the ultimate fact finder, and it is empowered to resolve all conflicts in the evidence . . . ." *Procito v. Unemployment Comp. Bd. of Rev.*, 945 A.2d 261, 262 n.1 (Pa. Cmwlth. 2008) (en banc). Here, the UCBR found August 3, 2023, to be the operative date of the incident and we will not disturb this finding on appeal as there is substantial evidence in the record to support that finding.

Relatedly, Claimant argues her counsel was ineffective as counsel did not subpoena the coworker, obtain a copy of the coworker's statement, or address the

---

[6] To the extent there was any variation in the exact phrasing of what was said, any variation does not matter as the comment Claimant admits to making was sufficient to find a violation of the Policy.

8

date discrepancy. Not only does it appear that Claimant did not raise this issue before the Board, *see Umedman v. Unemployment Compensation Board of Review*, 52 A.3d 558, 565 (Pa. Cmwlth. 2012) (observing that the Board may only consider issues expressly ruled on by a referee and this Court may not consider issues on appeal not raised before the Board), Claimant has not shown how this is material to this matter, particularly in light of her admission to making the statement.

In sum, the Referee, and subsequently the Board, was free to consider Claimant's statement as a party admission against interest, which is admissible in UC proceedings, and may be used as competent evidence supporting findings and conclusions. Therefore, we discern no error in the Board's Order.

### B. Violation of the Policy and Willful Misconduct

On appeal, Claimant argues that she did not commit willful misconduct and that her termination from employment was unjustified. (Claimant Br. at 12.) Claimant asserts that the motive in reporting the incident was sinister and that coworker created a hostile work environment. (*Id*.) The Board responds that its findings of fact are conclusive on appeal where such findings are supported by substantial evidence, and that Employer's witness testimony and Claimant's admissions support its findings. (Board's Br. at 8, 11-13.) The Board further asserts that Claimant's testimony about her discomfort using the same restroom as the transgender coworker was not reasonable under the circumstances because Claimant never raised this concern with Employer prior to the incident. (*Id*. at 12 (citing *Arbster v. Unemployment Comp. Bd. of Rev.*, 690 A.2d 805, 810 (Pa. Cmwlth. 1997) (holding that a claimant did not have good cause to violate an employer's work rule where an alternative means to address concerns existed)).)

Pursuant to Section 402(e) of the UC Law "[a]n employe shall be **ineligible for compensation** for any week . . . . **[i]n which [their] unemployment is due to [their] discharge** or temporary suspension **from work for willful misconduct** connected with [their] work . . . ." 43 P.S. § 802(e) (emphasis added). We have observed:

> Although not defined by the [UC] Law, **willful misconduct has been defined as** an act of wanton or willful disregard of an employer's interest, **a deliberate violation of an employer's rules**, **a disregard of the standards of behavior which an employer has the right to expect of an employee**, or negligence indicating an intentional disregard of an employer's interest or of the employee's duties and obligations to the employer.

*Seton Co. v. Unemployment Comp. Bd. of Rev.*, 663 A.2d 296, 300 (Pa. Cmwlth. 1995) (emphasis added) (citing *Myers v. Unemployment Comp. Bd. of Rev.*, 625 A.2d 622 (Pa. 1993)).

"The burden of proving willful misconduct rests with the employer." *Halloran v. Unemployment Comp. Bd. of Rev.*, 188 A.3d 592, 597 (Pa. Cmwlth. 2018) (citation omitted). "Where the employer asserts willful misconduct based on the violation of a work rule, the employer bears the burden of establishing the existence of the work rule and its violation by the employee." *Id*. (citation omitted). In turn, "[i]f the employer proves the existence of the rule, its reasonableness, and its violation by the employee, then the burden of proof shifts to the employee to prove that [the employee] had good cause for [their] actions." *Id*. (citation omitted). "A claimant has good cause if [their] . . . actions are justifiable and reasonable under the circumstances." *Sipps*, 181 A.3d at 482 (citation omitted). Even where there is no written policy, conduct that is "inimical to the best interests of the employer" may constitute willful misconduct. *Rivera v. Unemployment Comp. Bd. of Rev.*, 526 A.2d

10

1253, 1255 (Pa. Cmwlth. 1987). "Ultimately, [however,] the question of whether conduct rises to the level of willful misconduct is a question of law to be determined by this Court." *Sipps*, 181 A.3d at 482 (internal quotation marks and brackets removed) (citation omitted).

Here, the Policy that Claimant allegedly violated is Employer's discrimination, harassment, and bullying policy. The Policy's purpose statement provides Employer "is committed to enabling a diverse workforce where employees are welcome to contribute to corporate success without feeling **unwelcome based on their membership in a legally protected class**." (Policy § 1.0 (emphasis added).)[7] The Policy further provides, in pertinent part:

> 2.1 <u>Harassment</u>. [Employer] prohibits harassment against any employee **for any reason**. Prohibited conduct includes, **but is not limited to**, sexual harassment.
>
> . . . .
>
> 2.1.1 While **it is impossible to identify all the ways in which an employee can create a hostile work environment**, the following conduct could create such an environment and therefore *employees* **should refrain from engaging in such conduct**: jokes of a sexual nature, lewd language or gestures, staring or leering at another employee, unwelcome touching or close contact with a peer.
>
> . . . .

(Policy § 2.2 (underlining in original; bold emphasis added).)[8]

---

[7] A copy of the Policy appears in the Certified Record beginning at page 42.
[8] The Policy also prohibits discrimination. *See* Policy § 2.1, No one asserts Claimant's conduct constituted discrimination as there is no indication that Claimant was the transgender employee's supervisor or that the transgender employee suffered any adverse employment action based on gender identity.

11

Thus, harassment for any reason violates the Policy, as does creating a hostile work environment.

At the hearing, Employer's witnesses testified that the Policy was in place at the time of Claimant's employment and that Claimant was required to participate in virtual trainings on the Policy. (C.R. at 118-19, 122-23, 125.) In addition, Claimant acknowledged that she may have electronically signed the Policy. (*Id.* at 130-32.) This is substantial evidence to support a finding that the Policy existed and Claimant was aware of the Policy.

In addition, the Policy was reasonable because its stated goal was to prevent harassment against any employee of any kind. In addition to protecting employees from the untoward conduct and statements of others, the Policy is designed to promote a diverse workplace and protect Employer against potential liability under either Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e-2000e-17, or the Pennsylvania Human Relations Act (PHRA).[9] Although neither act expressly identifies "transgender" as a protected class, the courts have extended such protection under the "sex" class. As the Supreme Court of the United States explained: "An individual's homosexuality or transgender status is not relevant to employment decisions. That's because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 660 (2020). *See also Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) (citing *Bostock* as basis for concluding Title VII and the PHRA protect homosexual and transgender individuals from discrimination or sexual stereotyping). In *Doe*, coworkers asked the plaintiff, among other things, questions

_____

[9] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

about the plaintiff's sexual identity and orientation and the plaintiff's anatomy. *Id.* at 122.

Thus, Employer satisfied its burden of establishing the existence of the Policy, Claimant's knowledge of the Policy, and the Policy's reasonableness. However, Employer must also show that Claimant violated the Policy. Here, we conclude Employer has. The Policy, which the Board described as being a "zero tolerance policy," prohibits harassment **for any reason**. (Policy, § 2.2; Board Order at 3.) The Policy also prohibits conduct that creates a hostile work environment. (Policy § 2.2.2.) The Court cannot perceive a situation where asking about another employee's genitalia, whether that employee is transgender or not,[10] is appropriate in the workplace. A reasonable person would find such a question inappropriate.

Nor does it matter that the statement was not made directly to the transgender employee. Often, jokes or comments about third parties can create a hostile work environment. For example, in *Diehl v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 1118 C.D. 2010, filed November 12, 2010), the claimant was discharged for willful misconduct after making a statement to a coworker about a Christmas ornament that depicted President Barrack Obama. Specifically, the claimant remarked "I guess it's okay to hang them from trees now." *Id.*, slip op. at 3. The coworker to whom the claimant made the remark reported it to the employer. *Id.* Following an investigation, in which the claimant admitted to making the remark but claiming it was meant as a joke, the employer discharged the claimant for violating the employer's anti-harassment policy, which prohibited epithets, slurs, negative stereotyping, or threatening, intimidating, or hostile acts related to race. *Id.*

---

[10] Discussion of genitalia in general in a workplace is not appropriate. Here, Claimant's statement was not a general statement. Rather, it was a statement about a specific person's genitalia and that specific person was a co-worker, who also was transgender.

at 2-3.  We concluded that that statement, which "appear[ed] to be a thinly veiled reference to lynching . . . can be characterized as being denigrating or hostile towards a person, or group of people, based on their race."  *Id.* at 11-12.  That President Obama or someone of African-American descent did not personally hear the claimant's statement did not excuse the claimant's conduct.  It was enough that coworkers were reasonably offended and reported the remark to the employer.  *See also Baltimore v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 2259 C.D. 2013, filed June 3, 2014) (holding giving an envelope with inappropriate comments to one employee to give to another employee constituted harassment and supported a finding of willful misconduct).  "[E]ven a single incident of offensive language can constitute willful misconduct," *Poplin v. Unemployment Compensation Board of Review*, 690 A.2d 781, 783 (Pa. Cmwlth. 1997), and we are of the opinion that inquiring about another employee's genitalia rises to that level.[11]

Our inquiry does not end there, though.  We must examine whether Claimant had good cause for her actions.  *Halloran*, 188 A.3d at 597; *Sipps*, 181 A.3d at 482. Here, Claimant does not assert that she wanted to know how the transgender coworker identified because she wanted to know what pronouns to use when referring to the transgender coworker.[12]  She admits so much in her Petition for

---

[11] Even in the absence of the Policy, Claimant's specific conduct here, under this set of facts, was so inimical to Employer's interest and was below the standard Employer has the right to expect from its employees that it constituted willful misconduct.  *See Garrett v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 735 C.D. 2018, filed Nov. 15, 2018) (holding note left for supervisor with graphic drawings, obscenities, and insults violated employer's harassment policy and also "was beneath the standard of behavior that an employer can reasonably expect from its employees"); *Witkowski v. Unemployment Comp. Bd. of Rev.*, 633 A.2d 1259, 1261 (Pa. Cmwlth. 1993) (holding the claimant's racial slur "was so offensive that it should have been obvious that its use was inimical to [the e]mployer's best interest, and in complete disregard of the standards of behavior which [e]mployer has a right to expect from its employees").

[12] Moreover, there are less crass ways of determining this than asking a co-worker about another co-worker's genitalia.

14

Review where she states during a conversation with another coworker, "[t]he question came about. The question being did he still have his privates. That's it. Nothing more." (Petition for Review ¶ 19.) Rather, Claimant told Employer "it was her right to know what parts that the other employee had." (C.R. at 124; *see also* FOF ¶ 10.) After Employer confronted Claimant about the statement, Claimant told Employer she had a "right to know" because she was uncomfortable using the same restroom as the transgender employee. (C.R. at 129.)[13] However, importantly, Claimant admitted that she never informed Employer about this discomfort prior to the incident. (*Id.* at 130-31); *See also Arbster*, 690 A.2d at 810 (finding good cause did not exist where a claimant did not pursue alternative means to address concerns). Thus, Claimant did not establish good cause for her conduct. Therefore, we discern no error in the Board finding that Claimant's actions amounted to willful misconduct, which rendered Claimant ineligible for UC benefits under Section 402(e) of the UC Law.

## III.   CONCLUSION

In sum, the Board was permitted to use party admissions against interest as competent evidence to support its findings and conclusions. There was also substantial, competent evidence to show the existence of the Policy, Claimant's

---

[13] Claimant initially denied telling Employer that she "had a right to know" the type of her coworker's genitalia. (C.R. at 132.) However, Claimant subsequently acknowledged this, stating:

> Oh yeah, yeah, if it was a man or a woman because he gets identified as a woman but he looks like a man. And it is a scary feeling too. Like if you are in the restroom and then all of a sudden, you're coming out of a stall and you see a person there and it looks –

(*Id.*)

knowledge of the Policy, and Claimant's violation of the Policy. Claimant did not establish good cause for her conduct. Therefore, the UCBR correctly determined that Claimant was ineligible for UC benefits under Section 402(e) of the UC Law because of willful misconduct. Accordingly, we affirm.

_____
RENÉE COHN JUBELIRER, President Judge

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tammy L. Williams,            :
           Petitioner     :
                        :
        v.            :   No. 454 C.D. 2024
                        :
Unemployment Compensation  :
Board of Review,         :
          Respondent  :

# **O R D E R**

NOW, January 22, 2026, the Order of the Unemployment Compensation Board of Review, dated March 19, 2024, is **AFFIRMED**.

_____
RENÉE COHN JUBELIRER, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tammy L. Williams,               :
           Petitioner         :
                        :
       v.                   : No. 454 C.D. 2024
                        : Submitted: August 8, 2025
Unemployment Compensation  :
Board of Review,            :
           Respondent

BEFORE:   HONORABLE RENÉE COHN JUBILERER, President Judge
               HONORABLE STACY WALLACE, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

DISSENTING OPINION
BY SENIOR JUDGE LEAVITT           FILED: January 22, 2026

        The Unemployment Compensation Board of Review (Board) held that Tammy L. Williams (Claimant) violated Iron Mountain Information Management Services, Inc.'s (Employer) "Policy Against Discrimination, Harassment & Bullying" (Policy). Certified Record at 191 (C.R. __). The Board erred because Employer's Policy did not proscribe the conduct for which Claimant was discharged, *i.e.*, asking a coworker about the private parts of a transgender coworker, who was not present during the discussion. With respect, I dissent from the majority's decision to affirm the Board.

        The majority concludes that Employer's Policy did prohibit Claimant's question, reasoning that Claimant's question constituted harassment.[1] To that end,

---

[1] The majority focuses on the language in the Policy that Employer "is committed to enabling a diverse workforce where employees are welcome to contribute to corporate success without feeling unwelcome based on their membership in a legally protected class." *Williams v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 454 C.D. 2024, filed January 22, 2026), slip op. at 11 (citing C.R. 42) (emphasis omitted). This language states a goal, not a prohibition.

the majority relies on the statements in the Policy that "harassment against any employee for any reason" violates the Policy by, *inter alia*, "creating a hostile work environment." *Williams*, slip op. at 11-12 (emphasis added). The majority overlooks the language of Employer's Policy that limits harassment to personnel actions.

The relevant language states as follows:

2.1 <u>Discrimination</u>. Iron Mountain prohibits discrimination against any employee or applicant for employment, including but not limited to, discrimination on the basis of race, creed, color, national origin, sex, age, disability, religion, veteran status, familial status, marital status, sexual orientation, gender identity or expression, genetics, pregnancy or pregnancy-related conditions, citizenship and any other trait protected by law. *Discrimination and harassment including sexual harassment is prohibited in all employment practices including recruitment, hiring, training, promotion and all other personnel actions*. Employment decisions should be based on individual merit and job-related criteria only.

2.2 <u>Harassment</u>. Iron Mountain prohibits harassment against any employee for any reason. Prohibited conduct includes, but is not limited to, sexual harassment.

2.2.1 <u>Sexual harassment is broadly defined</u> as unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature when: (1) *submission to the conduct or advance is made either explicitly or implicitly a term or condition of employment* (e.g., requiring a subordinate to sit close to a supervisor or tolerate frequent touching); (2) submission to or rejection of the conduct or advance is used as a *basis for employment decisions* (e.g., promising a promotion in exchange for sexual favors); or (3) *the conduct or advance has the effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment* ("hostile work environment").

2.2.2 While it is impossible to identify all the ways in which an employee can create a hostile work environment, the following conduct could create such an environment and therefore employees should refrain from engaging in such conduct: jokes of a sexual nature, lewd language or gestures, staring or leering at another employee, unwelcome touching or close contact with a peer.

C.R. 42-43 (emphasis added).

In sum, the Policy defines "prohibit[ed] harassment" as "personnel actions," including unwanted, sexual advances *against a subordinate*. Section 2.2 of Policy's C.R. 42-43. After "broadly" defining sexual harassment in Section 2.2.1, the Policy continues in Section 2.2.2 by listing examples of what could create a hostile work environment, *i.e.*, "jokes of a sexual nature, lewd language or gestures, staring or leering at another employee, unwelcome touching or close contact with a peer." *Id*. While asking a coworker about a third person's private body parts might cause discomfort to the listener, it bears no similarity to any of these examples.

The majority emphasizes that the examples of "creating a hostile work environment" listed in Section 2.2.2 are not exhaustive. However, a hostile work environment has to be understood within the Policy's definition of "sexual harassment" as relating to "*employment practices* including recruitment, hiring, training, promotion and all other personnel actions." C.R. 42-43 (emphasis added). The majority simply sidesteps the Policy's directive that harassment concerns employment practices. Nothing in the record suggests that Claimant had authority to train, promote, or take personnel actions against any employee, including the coworker who was asked the untoward question.

A word or phrase must "be interpreted in context and read together with the entire provision." *Choice Fuelcorp, Inc. v. Zoning Hearing Board of Armstrong Township* (Pa. Cmwlth., No. 1515 C.D. 2012, filed May 16, 2013) (unreported), slip

MHL-3

op. at 9-10.[2]   In *Choice Fuelcorp*, for example, we rejected the landowner's argument that extraction constituted a "water related use" that was permitted in the floodway zoning district.   *Id.* at 9.  We explained that the phrase "water related uses," although not defined, had to be read in the context of the provision, which concerned "boating facilities" and "activities such as marinas, docks, wharves, piers, etc."  *Id.* at 9-10.  Water extraction was "not compatible with any of the example uses enumerated."  *Id.* at 10.  *See also Roethlein v. Portnoff Law Associates, Ltd.*, 81 A.3d 816, 822 (Pa. 2013) (holding, *inter alia*, that in interpreting the statute commonly known as the Loan Interest and Protection Law,[3] this Court erred by not considering "the context in which the words appear").

Employer presented no evidence that any of Claimant's coworkers were the target of harassment by Claimant, as Employer defined that conduct in its Policy. Nor did the Board make a finding that Claimant's coworker, the recipient of Claimant's question, was the victim of harassment.[4]   Board Adjudication at 2, Finding of Fact No. 6 (the coworker was "offended and reported" Claimant's comment to Employer).  Claimant's conduct, at most, caused offense.

---

[2] An unreported decision of this Court, issued after January 15, 2008, may be cited for its persuasive value pursuant to this Court's Internal Operating Procedures.  210 Pa. Code §69.414(a).

[3] Act of January 30, 1974, P.L. 13, *as amended*, 41 P.S. §§101-605.

[4] The Board noted that Employer has a "policy against discrimination, harassment, and bulling [sic] which specifically prohibits discrimination against any employee based on gender identity or expression."  Board Adjudication at 2.  It also stated that the Board "considers the claimant's public questions of the transgender employee's genitalia to be violative of harassment policy."  *Id.* at 3. The Board's conclusory statements on discrimination and harassment did not employ or relate to the actual language in the Policy.

Likewise, Claimant's single question of a coworker bears no relation to "the use of threats, force, or coercion[,]" which is the Policy's definition of bullying.  Section 2.3 of the Policy's C.R. 43.  Nor did her question rise to the level of "repeated infliction of verbal abuse" or "other verbal or physical conduct" that is "threatening, intimidating, or humiliating[.]"  *Id.*

In *Murraysville Telephone Company, Inc. v. Unemployment Compensation Board of Review*, 398 A.2d 250, 251 (Pa. 1979), our Supreme Court explained that "before an employee can be guilty of violating an employer's rule, he has to be made aware of that rule." The majority opines that "[a] reasonable person would find" Claimant's "question inappropriate." *Williams*, slip op. at 14. To be sure, Employer was free to discharge Claimant for asking an inappropriate question. However, to deny Claimant unemployment benefits on grounds of willful misconduct, Employer had to demonstrate that the claimant knew that her "inappropriate" question was prohibited. There is no such prohibition stated in Employer's policy.

The majority relies on *Diehl v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 1118 C.D. 2010, filed March 23, 2011) (unreported), for the proposition that it did not matter that Claimant's question was not within the presence of the transgender employee. *Diehl* is distinguishable. At issue in *Diehl* was "an anti-harassment policy that prohibits epithets, slurs, negative stereotyping, or threatening, intimidating or hostile acts that relate to race." *Diehl*, slip op. at 2. The Board in that case found that the claimant was given a written warning for violating the policy and warned of employment termination. A performance improvement plan specifically instructed "him to refrain from making sarcastic remarks or using potentially demeaning phrases." *Id*. at 3. The claimant thereafter stated to a coworker about a Christmas ornament that depicted President Barack Obama: "I guess it's okay to hang them from trees now." *Id*. at 3. We affirmed the Board's denial of benefits for the stated reason that the record "clearly indicates that [the c]laimant was aware of [the employer's] Policy[.]" *Id*. at 7.

Here, by contrast, the record does not "clearly indicate[]" that Claimant was aware that her question could violate Employer's Policy. *Diehl*, slip op. at 7. To find an employee ineligible for compensation benefits under Section 402(e) of the Unemployment Compensation Law (Law)[5] there must be proof of specific intent. *See Navickas v. Unemployment Compensation Review Board*, 787 A.2d 284, 290 (Pa. 2001) (an inadvertent or non-intentional mistake does not constitute "willful misconduct" under the Law). There can be no intent without advance warning.

Claimant acknowledged that she "asked a coworker a question about someone's private parts." Board Adjudication at 2, Finding of Fact No. 8. Without more, that single question did not prove an act of discrimination or harassment, as these terms are defined and used in Employer's Policy. I would reverse the Board's adjudication denying Claimant's application for unemployment compensation benefits.

_____
MARY HANNAH LEAVITT, President Judge Emerita

---

[5] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(e).

MHL-6